**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **TALECIA C.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 21 C 4580** |
| **v.** ) | |
| ) | **Magistrate Judge Finnegan** |
| **KILOLO KIJAKAZI, Acting** ) | |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

Plaintiff Talecia C. seeks to overturn the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the ALJ's decision. After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff protectively filed for DIB on August 9, 2019, alleging disability since December 31, 2017 due to: diabetes, narcolepsy, arthritis, a back condition, asthma, allergies, depression, and high blood pressure. (R. 71, 139-45, 173).[2] Born in 1981,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. She is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

[2] Following the administrative hearing (*see infra*), Plaintiff requested to amend the alleged onset date to August 9, 2017. (R. 10-11, 37).

Plaintiff was 36 years old as of the alleged disability onset date, making her a younger person (under age 50).  (R. 139); 20 C.F.R. § 404.1563(c).  Plaintiff has a high school education and lives in a third-floor apartment with family members.  (R. 16, 27-28, 174).  Plaintiff's prior work history includes: preparing vegetables at a naval base through Goodwill in 2003-2004 (R. 16-17, 29-31); cleaning houses and providing homecare through Catholic Charities in 2009-2011 and Premier Home Care in or around 2017 (R. 17-18, 22, 31); and serving as a front-desk security guard in 2015 and again in 2017.  (R. 18-23, 31-34, 183).[3]  Plaintiff has not engaged in any substantial gainful activity since the alleged onset date.  (R. 73).

The Social Security Administration denied Plaintiff's application initially on October 31, 2019, and again upon reconsideration on June 19, 2020.  (R. 50-67).  Plaintiff filed a timely request for a hearing and appeared before administrative law judge Luke Woltering (the "ALJ") on December 22, 2020.[4]  (R. 12-14, 98-99).  The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Thomas Gusloff (the "VE").  (R. 12-49).  On January 29, 2021, the ALJ found that Plaintiff has severe impairments in the form of chronic chest wall pain, narcolepsy, morbid obesity, asthma, lumbar degenerative disc disease, obstructive sleep apnea, diabetes mellitus, and a right ankle calcaneal spur, as well as non-severe impairments in the form of hypertension and depressive disorder, but that they do not alone or in combination meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 73-75).

---

[3]     Plaintiff testified that she also performed some work through a temp agency in 2016 but could not recall what that job entailed.  (R. 20, 32-33).

[4]     The hearing was held telephonically due to the COVID-19 pandemic.

2

After reviewing the medical and testimonial evidence, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except she cannot: climb ladders, ropes, or scaffolds; work around hazards such as unprotected heights and exposed moving mechanical parts; or tolerate more than occasional exposure to extreme cold or extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants. (R. 76). Additionally, Plaintiff can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*). The ALJ accepted the VE's testimony that: (1) a person with Plaintiff's background and this RFC could perform Plaintiff's past work as a cook helper, home attendant, and security guard; and (2) Plaintiff could perform a significant number of other jobs available in the national economy. (R. 44-46, 81-82). The ALJ thus found Plaintiff not disabled at any time from the alleged disability onset date through the December 31, 2018 date last insured ("DLI"). (R. 83). The Appeals Council denied Plaintiff's request for review on June 25, 2021 (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009); *Payne v. Colvin*, 216 F. Supp. 3d 876, 880 (N.D. Ill. 2016).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) made a flawed RFC determination for multiple reasons; and (2) erred in evaluating her subjective statements regarding the limiting effects of her symptoms.[5] As discussed below, this Court finds that the ALJ's decision is supported by substantial evidence.

---

[5] In her opening brief, Plaintiff also asserted a constitutional challenge to the ALJ's decision but withdrew the argument in her reply brief. (Doc. 22, at 11 n. 6).

**DISCUSSION**

**A.     Standard of Review**

A claimant is disabled within the meaning of the Social Security Act if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether she has a severe impairment or a combination of impairments that is severe; (3) whether her impairments meet or equal any impairments listed as conclusively disabling; (4) whether she can perform her past work; and (5) whether she is capable of performing any work in the national economy." *Gedatus v. Saul*, 994 F.3d 893, 898 (7th Cir. 2021) (citing 20 C.F.R. § 404.1520(a)-(g)). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Id*.

In reviewing an ALJ's decision, the Court may not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)); *see also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The Court "will uphold the ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the ALJ's conclusion." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (internal citations omitted). Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted).

**B.      Analysis**

**1.      RFC Determination**

Plaintiff argues that the case must be reversed or remanded because, in crafting the RFC, the ALJ: (a) improperly relied on the opinions of the state agency reviewers and lacked an evidentiary basis; (b) omitted limitations stemming from her narcolepsy, degenerative disc disease, and chest wall pain and, in turn, failed to account for her narcolepsy-related limitations in posing hypothetical questions to the VE; and (c) failed to consider her narcolepsy and obesity in combination with her other impairments.  (Doc. 15, at 5-12).  A claimant's RFC is the maximum work that she can perform despite any limitations.   20 C.F.R. § 404.1545(a)(1); SSR 96-8p.   "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions."  *Anna-Marie L. v. Kijakazi*, No. 21 C 50354, 2022 WL 4610120, at *2 (N.D. Ill. Sept. 30, 2022) (quoting *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012)).  "Both the RFC assessment and the hypothetical question posed to the [VE] must include all of a claimant's limitations supported by the medical record." *Joshua J. H. v. Kijakazi*, No. 21 C 837, 2022 WL 2905673, at *2 (N.D. Ill. July 22, 2022) (quoting *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021)).  "A flawed RFC assessment will not justify remand unless the claimant can identify additional limitations not already included in the RFC."  *Pamela S. v. Kijakazi*, No. 20 C 607, 2022 WL 1185604, at *4 (N.D. Ill. Apr. 21, 2022) (citations omitted).

### a. Opinions of the State Agency Reviewers and Evidentiary Basis

In determining Plaintiff's RFC, the ALJ stated that he found the opinion of the state agency physicians "generally persuasive." (R. 81). As Plaintiff notes, however, only one agency physician in fact provided an opinion regarding Plaintiff's capabilities—the only medical opinion of record. Although the ALJ indicated that the state agency physicians at both the initial and reconsideration levels found her capable of light work with postural and environmental limitations (Doc. 15, at 6 (citing R. 81)), James Madison, M.D., initially assessed that "[t]here [wa]s insufficient evidence in [Plaintiff's] file prior to [her] DLI of 12/31/18" to render an opinion. (R. 52-55). Nonetheless, on June 17, 2020, Victoria Dow, M.D., determined after reviewing the complete medical record that Plaintiff's spine disorders and obesity were severe impairments and that she could perform light work with: frequent climbing of ramps and stairs, balancing, kneeling, and crawling; occasional stooping, crouching, and climbing of ladders, ropes, and scaffolds; and avoidance of concentrated exposure to extreme cold or heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. (R. 60-66).[6]

Plaintiff contends that Dr. Dow's opinion "could not reasonably form a basis for the ALJ's RFC assessment" because, in addition to the spine disorders and obesity that Dr. Dow found severe, the ALJ also determined that Plaintiff has severe impairments in the form of narcolepsy, obstructive sleep apnea, asthma, diabetes, chronic chest wall pain, and a right ankle calcaneal spur. (R. Doc. 15, at 6-7). But the ALJ was not required to mirror the severe impairments found by Dr. Dow or "to parrot the limitations endorsed by

---

[6]     Since Dr. Dow limited Plaintiff to light work with postural and environmental limitations, the ALJ's error in suggesting that Dr. Madison also reached that conclusion at the initial level is harmless and does not support a remand. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (reaffirming that harmless error applies to social security cases).

any one physician" in crafting the RFC. *Julia R. v. Saul*, No. 19 C 1570, 2019 WL 6877597, at *2 (N.D. Ill. Dec. 17, 2019); *Paul D. v. Saul*, No. 19 C 4898, 2021 WL 76816, at *4 (N.D. Ill. Jan. 8, 2021) ("[T]he Court finds no error in the ALJ finding obesity a severe impairment but not including an obesity-related limitation or in her giving great weight to the state agency physicians' opinions despite that they did not find obesity a severe impairment."). Furthermore, Plaintiff disregards the fact that the RFC imposes greater postural and environmental limitations than those put forth by Dr. Dow (or any other physician), including limiting Plaintiff to no climbing of ladders, ropes, or scaffolds; only occasional crawling, balancing, kneeling, and climbing of ramps and stairs; no more than occasional exposure to pulmonary irritants; and no work around hazards such as unprotected heights and exposed moving mechanical parts. (R. 62-64, 76, 80-81).

Plaintiff contends that she had no obligation to furnish a more restrictive medical opinion, as it was her burden to "present evidence, not opinions." (Doc. 22, at 2) (citing *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021)). This may be true, but, as discussed below, Plaintiff fails to show how the medical evidence in this case supports limitations beyond those in the RFC. Moreover, contrary to Plaintiff's assertion that the RFC determination lacked an evidentiary basis and that the ALJ "cited no additional medical evidence" to support it (Doc. 15, at 7), the ALJ provided a detailed recitation of the medical evidence to explain why Plaintiff was capable of light work with greater postural and environmental limitations than set forth in Dr. Dow's opinion. (R. 77-81). *See Montalto v. Berryhill*, No. 17 C 5976, 2019 WL 1405602, at *12 (N.D. Ill. Mar. 28, 2019) (affirming ALJ's opinion that "described all the medical evidence she considered" in determining the claimant's RFC).

The ALJ reviewed Plaintiff's treatment records dating back to December 3, 2016, when she reported to her primary care physician Pamela Smith, M.D., that she had heard her knee pop while squatting and was in "just a little pain." (R. 77, 433). On exam, Plaintiff had normal range of motion, strength, and gait, as well as no tenderness or swelling. (R. 435). Dr. Smith assessed that Plaintiff was "in very stable condition" and ordered her to continue NSAIDs for five days and resume blood pressure medications, as she had potential complications due to uncontrolled blood pressure. (*Id.*). Three weeks later, on December 27, 2016, Plaintiff returned to see Dr. Smith, complaining of severe pain over her left ribs that was worse with coughing. (R. 436). A physical exam once again showed normal range of motion, strength, and gait, with no tenderness or swelling. (R. 437). Dr. Smith diagnosed Plaintiff with an upper respiratory infection and assessed that she was in "fair condition." She also instructed Plaintiff to purchase nasal saline and Pseudoephedrine and noted that Plaintiff was already taking muscle relaxers and Ibuprofen. (R. 438). On February 2, 2017, Dr. Smith assessed that Plaintiff's blood pressure was "not well controlled" and diagnosed her with hypertension, as well as chronic lower back pain that was "unchanged." (R. 438-41). Dr. Smith noted that Plaintiff had not kept an earlier appointment to assess blood pressure control. (R. 440). The next month, Plaintiff saw neurologist Serge Pierre-Louis, M.D., for evaluation of a headache. (R. 491-93). Dr. Pierre-Louis noted that Plaintiff had not been taking her blood pressure medication, called Hydrochlorothiazide, and he "strongly recommended" that she call Dr. Smith to discuss management of her blood pressure and comply with her medication before her next visit, as the elevated blood pressure might have been contributing to her headache. (R. 492).

8

On June 15, 2017, Plaintiff presented to the emergency department seeking a refill of Hydrochlorothiazide, which she had stopped taking the prior month after running out of refills. (R. 330-31). She denied any chest pain, lightheadedness, or fainting, and a physical exam was largely normal. (R. 331-32). Four days later, Dr. Smith noted that Plaintiff's blood pressure remained "not well controlled" and added Metoprolol to her medication regimen. (R. 441-43). Plaintiff's lower back pain remained "unchanged." (R. 444). A couple of months later, on August 9, 2017, Plaintiff visited a pain clinic; on intake, she reported having constant lower back and abdominal pain that she rated a level 10/10. (R. 499). At the pain appointment, Plaintiff stated that she had a history of lateral rib pain dating back six years (ever since a prolonged cough), which was worse than her back pain but decreased with her own manual pressure and was daily but not constant. (R. 504). Plaintiff was instructed to begin taking Gabapentin and applying Lidoderm. (R. 506).

The next month, Plaintiff returned to the pain clinic for follow-up evaluation of her chest wall pain. (R. 507, 513). On intake, her primary complaint was leg and lower back pain, which she characterized as constant and rated a level 10/10. (R. 507-08, 513). At her appointment, Plaintiff reported that her chest wall pain also remained 10/10 but that she had a "mild response" to her current medication regimen and she was able to perform activities of daily living. (R. 513-14). A knee exam was negative for crepitus, swelling, and tenderness (R. 515-16), and an x-ray of Plaintiff's left tibia and fibula was normal with maintained joint spaces and no fracture. (R. 283). Two days later, Plaintiff was given a left serratus anterior nerve block for her chest wall pain. (R. 522-23).

9

On October 3, 2017, Plaintiff saw Dr. Smith and reported right knee pain after walking fast and falling down because she was upset about her job.  (R. 444).  A physical exam showed some mild tenderness over Plaintiff's right patella but normal range of motion, strength, and gait with no swelling.  (R. 446).  Dr. Smith assessed that Plaintiff was in "stable condition" and prescribed NSAIDs for Plaintiff's right knee tenderness.  (*Id.*).  During an emergency department visit for a sore throat the following month, Plaintiff denied any chest, back, or muscle pain or shortness of breath, and a physical exam was largely normal.  (R. 333-35).

Three months later, on February 10, 2018, Plaintiff presented to the emergency department with complaints of wheezing, shortness of breath, and chest tightness.  (R. 336-37).  She also noted some right ankle pain that she'd been experiencing since falling down the month before.  (R. 337).  On exam, Plaintiff had mild bilateral wheezes but equal breath sounds, regular respirations, and symmetrical chest wall expansion, and she showed some tenderness over her right ankle laterally but normal range of motion.  (R. 339-42).  She was diagnosed with asthma exacerbation and possible reactive airway disease.  (R. 339-40, 342).[7]  After being given nebulizers, Plaintiff endorsed "feeling better" and reported that her chest tightness, chest pain, and dyspnea had resolved.  (R. 342).  An electrocardiogram and chest exam were unremarkable, and a chest x-ray showed no effusions/infiltrates.  (*Id.*).  Plaintiff was discharged with Albuterol, Ipratropium inhalers, and Prednisone and was advised to schedule an appointment with Dr. Smith within two weeks.  (*Id.*).

---

[7]     Plaintiff argues that the ALJ made an error of fact when he stated that she had no hospitalizations for asthma.  (Doc. 15, at 11 (citing R. 75)).  As Plaintiff acknowledges, however, the ALJ discussed this emergency department visit in his opinion.  The ALJ's misstatement was harmless.

On February 18, 2018, an MRI of Plaintiff's lumbar spine revealed "mild multilevel degenerative disc changes and degenerative facet arthropathy," as well as "prominence of the central canal vs small caliber syrinx[8] within the visualized distal spinal cord from the levels of the lower T11 through L1" and mild fatty infiltration of the filum terminale. (R. 284-85). Nearly a month later, on March 12, 2018, Plaintiff returned to see Dr. Smith and reported that she was having trouble breathing and was talking on the phone in her sleep. (R. 446-47). On exam, her lungs were clear to auscultation, and a musculoskeletal exam was normal apart from mild tenderness over her right patella. (R. 448). Dr. Smith assessed that Plaintiff was in "stable condition," noting that her shortness of breath had resolved, she had not been using Albuterol, and this was her first episode since. (R. 449). Additionally, Dr. Smith noted that Plaintiff's blood pressure was "poorly controlled" as she had accidentally been off Hydrochlorothiazide. (*Id.*). At her next appointment with Dr. Smith on April 16, 2018, Plaintiff presented with abdominal pain, nausea, vomiting, and diarrhea but denied shortness of breath and reported that she had not taken her blood pressure medications for three days. (R. 449-50). A physical exam was largely normal apart from mild tenderness over Plaintiff's right patella. (R. 451). Dr. Smith assessed that Plaintiff likely had viral gastritis but was in "stable condition" and instructed her to resume her blood pressure medications immediately on arriving home. (*Id.*).

On May 26, 2018, an MRI of Plaintiff's thoracic spine revealed "mild straightening of normal thoracic kyphosis." (R. 286). The MRI also showed "subtle high T2/STIR foci scattered within the thoracic spinal cord [that] may reflect sequela of prior inflammatory

---

[8] A syrinx is a fluid-filled cyst. Syringomyelia describes a syrinx that forms within the spinal cord. *See* Mayo Clinic, *Syringomyelia*, available at https://www.mayoclinic.org/diseases-conditions/syringomyelia/symptoms-causes/syc-20354771 (last visited Sept. 15, 2023).

or demyelinating process, among other possible etiologies." (*Id.*). A few weeks later, on June 12, 2018, Plaintiff returned to the pain clinic for a follow-up evaluation. (R. 524). She reported that she had had five days of pain relief after the left serratus anterior nerve block and was now experiencing left chest wall pain that worsened with movement. (*Id.*). Plaintiff also reported that Ibuprofen and Methocarbamol provided "minimal relief," but she had taken Tylenol No. 4 from her mother and had "good relief." (*Id.*). She had no motor or sensory deficits and no cauda equina symptoms. (R. 525). On exam, Plaintiff had a normal gait but tenderness to palpation of her lumbar muscles and positive bilateral lumbar facet loading. (R. 526). The treating physician noted that Plaintiff "[r]efused any pain interventions" and instead "wanted Opioid management," but there was "no indication for such a step." (R. 530). The physician started Plaintiff on Gabapentin and Lidocaine patches for her neuropathic pain, instructed her to continue Ibuprofen and Methocarbamol for her lumbar myofascial pain, and referred her to physical therapy, acupressure, and a pain psychologist. (*Id.*).

At a gynecology appointment on August 20, 2018, Plaintiff had increased blood pressure, and the treating physician noted "a lengthy discussion" with Plaintiff about going to the emergency department for blood pressure control. (R. 479-83). Plaintiff refused to do so and instead signed an "against medical advice" form and said she felt fine and would take her medications as soon as she got home. (R. 481). Two days later, on August 22, 2018, Plaintiff had a new patient evaluation at Stroger Hospital's Pulmonary Sleep Clinic due to trouble sleeping. (R. 575). Plaintiff reported excessive daytime sleepiness precluding her from driving and causing her to doze off several times per day, as well as snoring, sleep apnea, and some cataplexy symptoms (her legs get weak when excited,

but no loss of balance).  (R. 575-76).  She also scored 12/24 on the Epworth Sleepiness Scale (R. 576).  On exam, Plaintiff appeared alert and oriented.  (R. 580).  The treating physician, Swamy Nagubadi, M.D., diagnosed hypertension, narcolepsy with cataplexy, snoring, and possible depression, ordered a Polysomnogram/Multiple Sleep Latency Test (a sleep study), and counseled Plaintiff regarding weight loss, sleep hygiene, and other sleep-related habits.  (R. 580-81).

On August 30, 2018, Plaintiff returned to see Dr. Smith for a follow-up evaluation of her lower back pain, obesity, and hypertension, and reported that she was wheezing. (R. 452-53).  As to Plaintiff's hypertension, Dr. Smith assessed that it was "not well controlled," increased her Metoprolol dosage, and noted that Plaintiff had missed her last appointment for a blood pressure check.  (R. 454).  Dr. Smith also noted that Plaintiff's low back pain was "unchanged" and she was considering pulmonary function tests ("PFTs") for her shortness of breath.  (*Id.*).  The following month, on September 27, 2018, Plaintiff was admitted to the hospital with newly diagnosed diabetes presenting as diabetic ketoacidosis.  (R. 236-37).  Plaintiff was admitted to the medical intensive care unit and transferred to the general medical floor after she was stabilized.  (R. 237).  A chest x-ray revealed "mild prominence of the vasculature [that] may relate to mild pulmonary vascular congestion," no consolidation, and no pneumothorax or pleural effusion.  (R. 287).  She was discharged with Insulin Glargine and Lispro, as well as a glucometer and supplies to regularly check her blood glucose levels and was educated about hypoglycemia.  (R. 237).  The treating physician also noted Plaintiff was no longer on Hydrochlorothiazide for her hypertension and was started on Enalapril and continued on Metoprolol.  (*Id.*).

Plaintiff was instructed to follow up as an outpatient with the sleep clinic to address her obstructive sleep apnea. (*Id.*).

At an appointment on October 6, 2018, Dr. Smith assessed that Plaintiff's hypertension was "well controlled" and referred Plaintiff to diabetes mellitus class for her recent diagnosis. (R. 458-60). Dr. Smith once again noted that Plaintiff's low back pain was "unchanged," and Plaintiff was still considering PFTs for her shortness of breath. (R. 460). Plaintiff returned to see Dr. Smith on October 22, 2018 and reported that she was "doing ok." (R. 461-63). Plaintiff also indicated that she was unaware she'd been missing Metoprolol, and Dr. Smith adjusted her medication regimen. (R. 463-64). On October 31, 2018, Plaintiff returned to the sleep clinic. (R. 581). On exam, she again appeared alert and oriented, and Dr. Nagubadi assessed that Plaintiff's "[s]leep and mentation seem[ed] a bit better." (R. 587). He noted that a sleep study was previously scheduled and once again counseled Plaintiff regarding weight loss, sleep hygiene, and other habits. (R. 588).

The following month, on November 27, 2018, Plaintiff returned to the pain clinic for a follow-up evaluation of her chest wall pain. (R. 542-43). Plaintiff reported that: the left serratus anterior block she had previously been given had relieved her pain for two weeks at most and she "d[idn't] want to have any more injections"; she was requesting Tylenol No. 4, since she had taken some from a family member and felt pain relief; she went to a pain psychology session and did not want to participate in sessions anymore; she did not show up for an acupuncture appointment; she cancelled a follow-up pain appointment in September; and she was scheduled for an injection in October and did not appear for that appointment. (R. 543, 549). Plaintiff's medication regimen consisted of Gabapentin,

Amitriptyline, and Lidocaine patches, her pain was "partially controlled," and she reported being "partially able" to perform activities of daily living. (R. 543). The treating physician noted that Plaintiff displayed "aberrant behaviors" as reflected by her missing multiple appointments and taking opioid medications from family members. (*Id.*). A physical exam revealed no acute distress, swelling, or deformity, as well as no evident spasms or trigger points. (R. 545). The treating physician: referred Plaintiff to neurosurgery due to the previously documented syrinx; noted that Plaintiff's chest wall pain "may or may not be related to this syrinx but [Plaintiff] does not want further injections"; increased her Gabapentin dosage; instructed her to take Ibuprofen for mild pain and Baclofen only for severe pain; counseled Plaintiff regarding her medications, diet, and activity, among other things; and encouraged her to keep follow-up appointments. (R. 549). On December 27, 2018, Dr. Smith adjusted Plaintiff's hypertension medications. (R. 464-67).

Two months later, on February 26, 2019, Plaintiff returned to the pain clinic complaining of right knee pain, left abdominal pain, and chronic lower back pain. (R. 550-57). Plaintiff reported that Ibuprofen and Baclofen had been helping her back pain, reducing it to 4/10. (R. 557). Her knee pain was "bothering her the most, but [was] manageable with lidocaine patches." (*Id.*). A knee exam was negative for crepitus and swelling. (R. 559). The treating physician assessed that Plaintiff's chronic right knee pain was "improving," instructed Plaintiff to continue taking Ibuprofen and Baclofen and using Lidocaine patches, and ordered a right knee injection. (R. 560).

Plaintiff returned to see Dr. Smith nearly four months later, on April 24, 2019, for a follow-up evaluation of her low back pain, obesity, and hypertension and reported that she was trying to get pregnant. (R. 468-70). Dr. Smith assessed that Plaintiff's

15

hypertension was "well controlled," her back pain remained "unchanged," and she was still considering PFTs for her shortness of breath. (R. 471). Five days later, on August 29, 2019, Plaintiff had a right knee intraarticular steroid injection. (R. 496-97). An x-ray of Plaintiff's right ankle that same day showed no acute fracture or dislocation. (R. 288). At a follow-up appointment at the pulmonary sleep clinic later that day, Plaintiff recorded an Epworth Sleepiness Scale score of 24/24 and stated that she "had to reschedule [the] sleep study from February." (R. 588-90). On exam, she once again appeared alert and oriented. (R. 594). Dr. Nagubadi again ordered the sleep study, counseled Plaintiff regarding weight loss and sleep hygiene, and referred her to a lifestyle clinic. (R. 595).

On May 9, 2019, Dr. Smith decreased Plaintiff's insulin. (R. 471-72). A week later, Plaintiff returned to see Dr. Smith for a follow-up evaluation of her back pain, obesity, and hypertension and again reported that she was trying to get pregnant. (R. 472-74). Dr. Smith's assessment of her hypertension, low back pain, and shortness of breath remained unchanged from the visit the prior month. (R. 474-75). At a gynecology appointment on May 31, 2019, Plaintiff reported that she was "doing well" and denied chest pain or shortness of breath. (R. 483-87). On July 2, 2019, Plaintiff was evaluated for bariatric surgery in order to "increase viability for pregnancy." (R. 475-76). Plaintiff reported that she had been obese since the age of twenty-four and that she was currently at her highest lifetime weight with a BMI of 53. (R. 476). In a review of systems, the treating physician noted tachycardia, chest pain, shortness of breath, and numbness and tingling in Plaintiff's hands. (*Id.*). A physical exam was largely normal, and the treating physician recommended that Plaintiff consider medical weight management, as well as bariatric surgery after delivery of any pregnancy. (R. 479).

Plaintiff returned to the pain clinic on July 30, 2019 and reported worsening left rib pain, again noting that she had good but short-term pain relief from the serratus anterior nerve block. (R. 571). Plaintiff also complained of low back pain with no radiation and bilateral heel pain that was worse with standing and walking. (*Id.*). She reported "mild relief" from Ibuprofen and Methocarbamol. (*Id.*). The treating physician diagnosed intercostal neuralgia, referred Plaintiff to physical therapy, educated her about the importance of diet and exercise, and discontinued Ibuprofen and started Plaintiff on Naproxen and Cymbalta. (R. 574). The next month, on August 20, 2019, Plaintiff presented to the emergency department with anterolateral elbow pain, which she was concerned could be indicative of a heart attack. (R. 350-51). Plaintiff reported that she had been taking Ibuprofen and a muscle relaxant prescribed by the pain clinic, which reduced the pain from 10/10 to 6/10. (R. 351). She denied shortness of breath, chest pain, and exertional symptoms, and a physical exam was largely normal. (R. 351-53). Treating physicians determined that Plaintiff likely had a muscle or tendon strain and instructed her to rest her arm, continue medications prescribed by the pain clinic, and follow up with the pain clinic and Dr. Smith. (R. 353).

The ALJ thoroughly reviewed these medical records, including records pre-and post-dating the relevant period, and reasonably determined that they are consistent with the stated RFC. *Pamela S.*, 2022 WL 1185604, at *4 (quoting *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021)) ("The ALJ 'canvassed the medical evidence and fully accounted for' [the claimant's] limitations supported by the record."). Significantly, no physician of record imposed greater restrictions than those found by the ALJ. *Hosea M. v. Saul*, No. 18 C 2926, 2019 WL 5682835, at *7 (N.D. Ill.

17

Nov. 1, 2019) (quoting *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018)) ("[C]ourts within this Circuit have repeatedly held that 'there is no error' in the formulation of an RFC 'when there is no doctor's opinion contained in the record that indicates greater limitations than those found by the ALJ.'").

### b. Limitations Related to Narcolepsy, Lumbar Degenerative Disc Disease, and Chest Wall Pain

Plaintiff next claims that the ALJ erred because, despite concluding that her narcolepsy, lumbar degenerative disc disease, and chronic chest wall pain are severe impairments, the ALJ failed to incorporate additional limitations related to them in the RFC. (Doc. 15, at 7-8, 10-11). Indeed, Plaintiff suggests that the ALJ "failed to include any restrictions" related to Plaintiff's narcolepsy and chest wall pain (as these were among the six additional impairments that the ALJ, but not Dr. Dow, found to be severe), and claims "additional physical limitations" should have been included related to her lumbar degenerative disc disease. (*Id.* at 7) (citing *Desiree B. v. Saul*, No. 18 C 8129, 2019 WL 6130814, at *3 (N.D. Ill. Nov. 19, 2019)) ("A finding that an impairment is severe cannot square with a conclusion that it imposes no limitations."). This Court disagrees.

Looking first to Plaintiff's narcolepsy, Dr. Dow identified the condition as one of the bases for including environmental limitations such as a restriction to avoid concentrated exposure to hazards (R. 63-64), and the ALJ included a limitation to no work around hazards in the RFC. (R. 76, 80-81). *See, e.g.*, *Brian C. v. Kijakazi*, No. 22 C 1447, 2023 WL 4564564, at *10 (N.D. Ill. July 17, 2023) (no error where the ALJ accommodated the plaintiff's migraine headaches and associated dizziness with restrictions against climbing ladders, ropes, and scaffolds). Plaintiff suggests that the ALJ erred by omitting additional restrictions from the RFC, namely, a need to nap or be off task. (Doc. 15, at 8). For

support, Plaintiff points to her hearing testimony that: she dozed off and took naps while working, which lasted anywhere from 10 minutes to an hour; she was caught sleeping "all the time" at work; her narcolepsy caused her to doze off several times daily, requiring "multiple unscheduled breaks in her work"; she would fall asleep standing up; other employees had to wake her; her narcolepsy caused her to lose at least two jobs; and she was not supposed to drive because of her narcolepsy. (*Id.* at 8, 11-12 (citing R. 19, 23-24, 27, 29, 31, 576)). She also relies on her self-reported symptoms at the pulmonary sleep clinic (R. 576), and one of her scores on the Epworth Sleepiness Scale.[9] (R. 590).

Notably, Plaintiff identifies no objective evidence from the nearly three-year medical record that the ALJ reviewed to show that her narcolepsy causes functional limitations requiring her to nap and be off task during the workday. *Green v. Saul*, 781 F. App'x 522, 528 (7th Cir. 2019) ("The RFC does not mention that [the claimant] naps for two hours every day, but this requirement is not supported by evidence other than her testimony, which the ALJ did not credit. At most, the medical records say that she will experience 'daytime sleepiness or drowsiness' and cautions [the claimant] from operating a motor vehicle or engaging in other activities that are hazardous 'in the presence of diminished alertness'—limitations for which the RFC accounts."); *Candice A.Z. v. Kijakazi*, No. 19 C 8174, 2021 WL 3187783, at *10 (N.D. Ill. July 28, 2021) (finding that the ALJ was "not required to credit" the claimant's alleged need to nap for multiple hours per day

---

[9]     The Epworth Sleepiness Scale is based on a patient's self-reported symptoms. *Aaron S. v. Kijakazi*, No. 21 C 00014, 2022 WL 2680170, at *3 n.7 (S.D. Ind. July 12, 2022) (citation omitted). The test is "a measurement of a person's degree of daytime sleepiness at a given point in time" and a person's score "is determined from the answers to a brief questionnaire." *G.S. v. Kijakazi*, No. 20 C 50232, 2021 WL 6201303, at *1 (N.D. Ill. Dec. 20, 2021). "A score of 0-5 indicates normal daytime sleepiness; a score from 6-10 indicates higher normal daytime sleepiness; a score of 11-12 indicates mild excessive daytime sleepiness; a score of 13-15 indicates moderate excessive daytime sleepiness; and a score of 16-24 indicates severe excessive daytime sleepiness." *Id.* (citation omitted); *see also* https://epworthsleepinessscale.com/about-the-ess/ (last visited Sept. 15, 2023) (same).

where no physician opined that such a requirement was necessary and only the claimant's testimony supported it).

It is true that "[s]ubjective tests, such as the Epworth Sleepiness Scale, are often used in diagnosing and determining the severity of narcolepsy and cataplexy." *G.S.*, 2021 WL 6201303, at *1 (citation omitted). Plaintiff points to her 24/24 score on the Epworth Sleepiness Scale on April 29, 2019 (R. 588-90)—nearly four months after the relevant period in this case (R. 16, 23)—and claims that this "indicates that [her] daytime sleepiness was severe and debilitating." (Doc. 15, at 13). Yet on August 22, 2018, Plaintiff scored 12/24, indicating only mild excessive daytime sleepiness (R. 575-76), and, as the ALJ noted, Dr. Nagubadi found that Plaintiff's "sleep and mentation seem[ed] a bit better" at an appointment on October 31, 2018. (R. 79, 587). Indeed, Plaintiff does not identify any physician of record who opined that a napping or off-task limitation was necessary, and instead merely speculates that "[n]arcolepsy with such extreme symptoms could easily cause [her] to be off task more than 15% of a workday" and thus preclude full-time employment. (Doc. 15, at 12). *See Stewart v. Berryhill*, 731 F. App'x 509, 510 (7th Cir. 2018) ("Unsubstantiated claims are of course, no substitute for evidence.") (internal quotations and citation omitted). In such circumstances, the ALJ did not err in failing to ask the VE about "what limitations narcolepsy would cause on the job." (Doc. 15, at 11-12). *See Edward H. v. Kijakazi*, No. 20 C 3847, 2023 WL 2683171, at *10 (N.D. Ill. Mar. 29, 2023) ("[T]he Seventh Circuit has made it clear that the ALJ is only required to include limitations that are supported by the record in the hypotheticals posed to the VE and in the RFC assessment.") (internal quotations and citation omitted).

Plaintiff next argues that the ALJ failed to include appropriate limitations related to her chest wall pain and lumbar degenerative disc disease. (Doc. 15, at 10-11). Plaintiff first takes issue with the RFC's restriction to light work, involving: (1) lifting and carrying 20 pounds occasionally and 10 pounds frequently; and (2) standing, sitting, and walking for 6 hours in an 8-hour workday. (*Id.*). According to Plaintiff, she would be unable to meet these restrictions based on her testimony that: "she has never lifted more than 20 pounds at any job, and the last time she lifted that amount of weight at her employment was in 2009-2011"; "[s]he lifted only 10 pounds for work in 2018, and even that caused her significant pain in her left side"; and "she laid down all day, which would preclude standing/sitting/walking for 6 hours in an 8-hour workday." (*Id.* (citing R. 18, 26, 37)). The only objective medical evidence Plaintiff identifies in support of her "limited ability to move" are the MRIs of her lumbar and thoracic spine in February and May 2018 (R. 284-86)—both of which the ALJ and Dr. Dow considered. (Doc. 15, at 11); (R. 62-64, 78, 80).

Again, Plaintiff does not identify any doctor who found that these MRIs (or any other medical evidence) warranted greater restrictions. *Hosea M.*, 2019 WL 5682835, at *7; *Best*, 730 F. App'x at 382. Nor does she explain how the mild degenerative changes seen in her lumbar spine (R. 80, 285), mild straightening seen in her thoracic spine (R. 286), and multiple findings of normal strength, range of motion, and gait on exam (R. 332, 335, 353, 435, 437, 446, 448, 451, 495, 580, 587, 594) support additional limitations in lifting, carrying, standing, sitting, or walking.

Finally, Plaintiff contends, without citing any evidence, that the lack of any pushing or pulling restrictions in the RFC "completely ignored her intense chest wall pain." (Doc. 15, at 10). But "[i]t was Plaintiff's burden 'to provide evidence that [her chest wall pain]

supports specific limitations affecting [her] capacity to work.'" *Jimmie W. v. Kijakazi*, No. 19 C 2601, 2021 WL 5578754, at *9 (N.D. Ill. Nov. 30, 2021) (quoting *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018)). This means "identifying any objective evidence in the record corroborating [her] allegations . . . and showing how [her] medically determinable impairments caused any limitations beyond those the ALJ found," which Plaintiff did not do. *Id.* (internal quotations and citations omitted).

### c. Consideration of Narcolepsy and Obesity in Combination with Other Impairments

Finally, Plaintiff objects that the ALJ failed to consider her narcolepsy and obesity in combination with her other severe and non-severe impairments. (Doc. 15, at 9-10). As to Plaintiff's obesity, Plaintiff primarily argues that the ALJ failed to sufficiently consider the combined effects of her obesity and various sources of pain. Specifically, Plaintiff states that: she testified about her difficulties walking, standing, and toileting "due to her weight and pain, as well as her need to lay down often"; she "suffered significant pain, especially low back pain and chest wall pain"; she rated her pain as 10/10 on multiple occasions and sought treatment at a pain clinic between June 2018 and July 2019; she treated her pain with medication, pain patches twice daily, a pain block for her chest pain, and a steroid injection in her knee." (*Id.* at 10). But the ALJ considered all of this testimony and related evidence and expressly stated that Plaintiff's "pain complaints have been considered in combination with her morbid obesity in limiting her to a range of light exertional work with postural and other limitations set forth [in the RFC]." (R. 80). While it may be true, as Plaintiff notes, that "[o]besity can greatly impact pain" (Doc. 15, at 10), the ALJ acknowledged Plaintiff's complaints of low back pain, chest wall pain, and pain stemming from her right ankle calcaneal spur, and Plaintiff has not shown that her pain

warrants greater restrictions than those provided in the RFC. *Lyn P. v. Saul*, No. 19 C 1596, 2021 WL 2823089, at *8 (N.D. Ill. July 7, 2021) (quoting *Sosh v. Saul*, 818 F. App'x 542, 546 (7th Cir. 2020)) ("A claimant who does not 'identify medical evidence that would justify further restrictions' is not entitled to remand."). Moreover, after acknowledging the combined impact of Plaintiff's various sources of pain and her obesity, the ALJ went on to consider Plaintiff's sleep-related impairments, asthma, and diabetes, and explained that he "included environmental and other limitations due to *these impairments*." (R. 80-81) (emphasis added).

In concluding her arguments related to the RFC, Plaintiff asserts that all of the ALJ's errors "were harmful because the evidence reflects [she] could not even perform work at the sedentary level, due to her combination of impairments." (Doc. 15, at 11). But no physician opined—and the ALJ's review of the medical record did not support— such a restriction. *Lyn P.*, 2021 WL 2823089, at *8 (quoting *Fanta v. Saul*, 848 F. App'x 655, 659 (7th Cir. 2021)) ("claimant failed to 'point to any objective evidence or medical opinions in the record that support stricter limitations' than those set by the ALJ").[10] "Essentially, an ALJ's RFC analysis 'must say enough to enable review of whether the ALJ considered the totality of a claimant's limitations." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022) (quoting *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021)). The ALJ's analysis did so here, and the decision is thus supported by substantial

---

[10]    The Court is unpersuaded by Plaintiff's additional argument that the ALJ should have consulted a medical expert because no medical opinion considered her severe impairments, particularly her narcolepsy. (Doc. 15, at 8). *See Lyn P.*, 2021 WL 2823089, at *8 (quoting *Deborah M.*, 994 F.3d at 791 and *Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2019)) ("The ALJ determined that the record did not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in [his] decision. The ALJ was not required to obtain an additional medical opinion because the record contained adequate information for the ALJ to render a decision.").

evidence.  *See Biestek*, 139 S. Ct. at 1554 ("Substantial evidence is not a high hurdle to clear – it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

### 2. Plaintiff's Subjective Statements

Plaintiff argues that the case also requires reversal or remand because the ALJ erred in assessing her subjective statements regarding her symptoms.  In evaluating a claimant's subjective symptom allegations, an ALJ must consider several factors including:  the objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication; treatment and other measures besides medication taken to relieve pain or other symptoms; and functional limitations due to pain or other symptoms.   20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017).  "'An ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to her ruling."  *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022)).  "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong."  *Grotts*, 27 F.4th at 1279 (citation omitted); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support"). "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts*, 27 F.4th at 1278.

In a Function Report dated October 22, 2019, Plaintiff stated that her ability to work is limited by: lower back pain, which prevents her from walking a whole block; back and knee pain, if she walks too long; arthritis in her right knee and back, which "makes [her] stiff and heavy with sharp pain that feels like a charlie [*sic*] horse"; rib pain caused by sitting for too long; severe depression and migraines; diabetes; narcolepsy; asthma; and allergies. (R. 195). Plaintiff noted trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and using her hands, among other things. (R. 200). She estimated that she can walk half a block "on a good day" and needs more than 10 minutes before she can resume walking. (*Id.*). Plaintiff also stated that she needs help dressing, bathing, caring for her hair, and using the toilet due to her back, rib, and left arm pain. (R. 196). She does not prepare food or meals, do household chores, or do house or yard work, as she is "in a lot of pain most [of the] time" and "can't get out of bed due to [her] arthritis, narcolepsy, and depression." (R. 197-98).

At the December 22, 2020 hearing before the ALJ, Plaintiff testified that she believes she is unable to work because of pain in her lower back and pain in her left rib. (R. 23). She is "always in pain" when she goes to work. (*Id.*). Plaintiff stated that she is unable to leave the house because she cannot clean herself. (R. 24). She testified that, in 2018, she was able to stand for no more than about 5 to 10 minutes, could walk a block, and was able to lift no more than 10 pounds. (R. 25-26). When she sits for too long, her ribs start to hurt, causing her to use pain patches and take medicine. (*Id.*). When she experiences rib pain, she lies down "all day." (R. 39). Plaintiff rated her pain to be a level 10/10. (*Id.*). Because of her narcolepsy, she is not supposed to drive and gets around

by cab or her sister.  (R. 27).  Plaintiff also testified that her narcolepsy causes her to doze off "all throughout the day."  (R. 29).

The ALJ acknowledged these allegations but found that they were neither consistent with nor supported by the evidence of record.  (R. 76-80).  First, the ALJ reasonably concluded that Plaintiff's complaints of disabling pain and limitations are not supported by the medical evidence.  (R. 80-81).  As to Plaintiff's alleged limitations in lifting, carrying, walking, and standing, the ALJ acknowledged Plaintiff's testimony that, during the relevant period, she could only lift about 10 pounds, stand for 5 to 10 minutes, and walk one block.  (R. 76-77).  But the ALJ found such testimony inconsistent with her "generally normal" physical exams, including normal range of motion, strength, and gait. (R. 77-80).  *Gwendolyn B. v. Saul*, No. 20 C 3244, 2021 WL 1812879, at *8 (N.D. Ill. May 6, 2021) (quoting *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018)) ("[D]iscrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). The ALJ also noted that, despite Plaintiff's complaints of low back, chest wall, and right ankle pain, the MRI of Plaintiff's lumbar spine in February 2018 revealed only mild degenerative changes (R. 78, 80), and she reported some improvement in her back pain due to medication by February 2019. (R. 557).

Additionally, the ALJ considered Plaintiff's conservative course of treatment, as well as her lack of compliance with certain treatment modalities.  (R. 80-81).  Receipt of conservative treatment is a legitimate reason to find a claimant not entirely credible, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005), and here, Plaintiff's treatment consisted primarily of appointments, medication, and some injections.  While Plaintiff experienced diabetic and asthmatic episodes requiring hospitalization and acute medical

treatment on occasion, her treatment records reflect that these were isolated incidents and she was responsive to treatment and discharged in improved condition each time. (R. 237, 342).

Plaintiff contends that the ALJ erred in stating that she did not receive treatment for her narcolepsy, specifically claiming that the ALJ overlooked her appointments at the pulmonary sleep clinic. (Doc. 15, at 12-13). But the ALJ considered Plaintiff's three appointments at the sleep clinic in August 2018, October 2018, and April 2019. (R. 79-80 (citing R. 575, 587, 595). Aside from counseling Plaintiff about weight loss, sleep hygiene, avoiding driving, and other sleep habits and referring her to lifestyle and psychiatry clinics, the treatment records from those three appointments—two of which occurred during the relevant period—do not reflect any prescription of sleep-related medication.[11] Indeed, the only other treatment reflected in these records is Dr. Nagubadi's ordering urine toxicology screenings and the Polysomnogram/Multiple Sleep Latency Test (or sleep study), which was never completed. According to treatment records, Dr. Nagubadi first ordered the sleep test on August 22, 2018 (R. 581), and he noted that it had not yet been completed at the follow-up appointments in October 2018 and April 2019. (R. 588, 595).

Plaintiff objects that the ALJ should have explored her reasons for not completing the sleep study before using that as a basis for discounting her testimony. (Doc. 15, at 13; Doc. 22, at 9-10) (citing *Roddy v. Astrue*, 705 F.3d 631, 638-39 (7th Cir. 2013) and *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009)). This argument is unpersuasive.

---

[11] One of the treatment notes, from Plaintiff's first visit to the clinic on August 22, 2018, mentions prescribing Metoprolol, which Plaintiff was previously prescribed for her hypertension. (R. 441-43, 581). At that visit, Plaintiff also reported that the last time she had been on sleep-related medication was in 2013. (R. 576).

Plaintiff did not identify any reasons in her opening brief, during her counsel's questioning at the hearing, or anywhere else in the administrative record for her failure to complete the sleep study.[12]  Then in her reply brief, Plaintiff claimed for the first time that she had "many reasons for delaying" the sleep study, suggesting that she did not have an opportunity to complete it during the relevant period because of her four-day hospitalization due to diabetes in late September 2018, her "significant pain from her back conditions," and "suffering from her other medical conditions."  (Doc. 22, at 9-10).[13]

To begin, Plaintiff never told Dr. Nagubadi that she was having difficulty completing the sleep study for these or any other reasons.  *See Araceli D. v. Saul*, No. 19 C 3487, 2021 WL 392698, at *5 (N.D. Ill. Feb. 4, 2021) (rejecting similar argument where the plaintiff "never raised any of the stated concerns [about possible reasons for limited treatment] with her medical providers").  Moreover, the ALJ noted that Plaintiff was non-compliant with or refused other treatment options besides the sleep study.  For example, at a November 2018 appointment at the pain clinic, Plaintiff stated that she did not want to have any more injections or participate in more pain psychology sessions, and she had either cancelled or failed to appear for multiple appointments, including an acupuncture appointment, pain appointment, and scheduled injection.  (R. 543, 549).  The record reflects that, despite Plaintiff's comments about not wanting any more injections, she had at least one injection on her right knee in April 2019.  (R. 496-97).  There is no indication that Plaintiff proceeded with acupressure, acupuncture, physical therapy, or pain

---

[12]      Indeed, in her opening brief, Plaintiff states that "[a] sleep study was ordered, but apparently not completed before the time the medical records were provided."  (Doc. 15, at 13).

[13]      Plaintiff also claims that she "already had sleep studies in the past" but admits that any such studies were not included in the administrative record.  (*Id.* at 9 (citing R. 493)).

psychology appointments despite being ordered to do so.  (R. 324, 394, 530, 543, 549, 574).  Treating physicians also noted that Plaintiff had taken opioid medications from family members and was requesting that some be prescribed, but there was "no indication for such a step."  (R. 524, 530, 543).

Plaintiff claims that the ALJ's evaluation of her symptoms was nonetheless erroneous because the ALJ's discussion of her narcolepsy and daytime sleepiness was "non-specific." (Doc. 15, at 12).  In particular, Plaintiff suggests that it was inadequate for the ALJ to state that she was "evaluated for sleep complaints" and highlight the normal examination findings at her visits to the pulmonary sleep clinic because: (1) the ALJ did not pay enough attention to her complaints about her sleep issues; and (2) the ALJ's consideration of her normal findings, such as finding her alert and oriented on exam, demonstrates a misapprehension of narcolepsy.  (*Id.* at 12-13).  As explained above, the ALJ considered Plaintiff's visits to the pulmonary sleep clinic and acknowledged her complaints of excessive daytime sleepiness.

As to her second argument, Plaintiff contends that "[e]ven though other exam findings may have been normal, this says nothing about the severity or limiting effects of [her] narcolepsy." (*Id.* at 13).  In support, Plaintiff cites the Social Security Administration's Program Operations Manual System ("POMS") DI 24580.005.  Indeed, Plaintiff contends that the ALJ erred insofar as he "mentioned the lack of a sleep study without explaining its significance to the treatment of her narcolepsy" (*id.* at 14), yet simultaneously points to the POMS guidance that—with the exception of a sleep study—other laboratory studies will be normal and provide no evidence of narcolepsy.  *See* POMS DI 24580.005(B).[14]

---

[14]     According to POMS DI 24580.005, the presence of cataplexy is "ordinarily sufficient to establish narcolepsy, without laboratory sleep studies."  As Plaintiff notes, her sleep clinic records from August 22,

Since Plaintiff failed to complete the sleep study, there is nothing in the medical record to support her claims of disabling sleep problems.

Finally, the Court agrees with Plaintiff that the ALJ's discussion of her daily activities does not necessarily undermine her complaints of pain and limitations, but this does not warrant remand.  First, the ALJ did not improperly equate Plaintiff's ability to engage in those activities with an ability to work.  (R. 78-80); *see Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("ALJ did not equate [the claimant's] ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules").  In addition, "not all of the ALJ's reasons must be valid as long as *enough* of them are." *Kaczmarek v. Berryhill*, No. 17 C 2785, 2018 WL 6192185, at *4 (N.D. Ill. Nov. 28, 2018) (quoting *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009)).  As discussed above, the ALJ provided sufficient reasons for discounting Plaintiff's subjective statements regarding her symptoms.

"The ALJ's credibility assessment need not be perfect; it just can't be patently wrong."  *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)).  Viewing the record as a whole, the ALJ provided valid reasons for discounting Plaintiff's subjective

---

2018 and October 31, 2018 reflect that she reported symptoms of cataplexy (*i.e.*, her "legs get weak when [she] gets excited, but w[ith] no loss of balance" on a weekly basis (Doc. 22, at 9), and Dr. Nagubadi included "narcolepsy with cataplexy" in the list of diagnoses for those visits.  (R. 576, 580, 583, 587).  However, at Plaintiff's April 22, 2019 visit, Dr. Nagubadi noted that her cataplexy symptoms were "questionable," and he did not include narcolepsy with cataplexy in Plaintiff's diagnoses.  (R. 589, 595).  Regardless, neither Dr. Nagubadi nor any other physician opined that Plaintiff's narcolepsy, with or without cataplexy, caused specific functional limitations requiring restrictions beyond those reflected in the RFC.

statements regarding her symptoms and fairly concluded that she has an RFC for light work with postural and environmental limitations beyond those assessed by any physician of record. *See Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (finding no error where "[i]t was because of and not in spite of [the claimant's] testimony that the ALJ limited her to a more restrictive residual functional capacity finding than any physician on the record"). Since that decision is supported by substantial evidence, Plaintiff's motion to remand the case for further consideration of these issues is denied. *Bruno v. Saul*, 817 F. App'x 238, 241 (7th Cir. 2020).

## **CONCLUSION**

For reasons stated above, Plaintiff's request to reverse or remand the case is denied and the Commissioner's Motion for Summary Judgment [20] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: September 19, 2023

SHEILA FINNEGAN
United States Magistrate Judge